**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

FOREST GUARDIANS, a non-profit
New Mexico corporation, and
DEFENDERS OF WILDLIFE, a non-
profit Washington, D.C. corporation,

    Plaintiffs-Appellants,

v.

BRUCE BABBITT, Secretary of the
Interior,

    Defendant-Appellee.

No. 97-2370
(D.C. No. CIV 97-0453)

---

**ORDER**
**Filed April 22, 1999**

---

Before **PORFILIO**, **EBEL** and **KELLY**, Circuit Judges.

---

This matter comes on for consideration of appellee's petition for rehearing

and suggestion for rehearing en banc. Upon consideration whereof, the petition

for rehearing is denied by the panel that rendered the decision. The Court will,

however, amend the opinion filed on December 22, 1998, as follows:

> The first sentence of the first full paragraph in column two at 164
> F.3d 1269 of the West's Federal Reporter advance sheets (first
> sentence of first full paragraph on page 20 of our slip opinion) is
> amended to read: Even in mandamus cases, which inherently involve

court discretion, we have often spoken in strong, and occasionally even absolute, language with regard to the court's duty to enforce agency action mandated by Congress.

The first sentence of the first full paragraph in column two at 164 F.3d at 1274 of the West's Federal Reporter advance sheets (first sentence of first full paragraph on page 34 of the slip opinion) is amended to read: While we hold that the Secretary must be ordered to comply with his statutory duty to publish a final regulation regarding designation of the critical habitat for the silvery minnow without regard to his preferred priorities, any order now to impose a new deadline for compliance must consider what work is necessary to publish the final rule and how quickly that can be accomplished.

The last paragraph of the opinion, at 164 F.3d at 1274 of the West's Federal Reporter advance sheets (page 35 of the slip opinion) is amended to read: We REVERSE the district court's denial of plaintiffs' motion to review agency action, VACATE the stay order, and REMAND to the district court to order the Secretary to publish, as soon as possible, "a final regulation, based on such data as may be available at that time, designating, to the maximum extent prudent," the critical habitat for the Rio Grande silvery minnow, as is required by 16 U.S.C. § 1533(b)(6)(C)(ii).

An amended copy of this opinion is attached to this order.

A copy of the petition was circulated to all active judges of the court. No judge called for a poll. Consequently, the en banc suggestion is denied.

Entered for the Court

PATRICK FISHER, Clerk of Court

By:
    Keith Nelson
    Deputy Clerk

- 2 -

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 22 1999**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

### TENTH CIRCUIT

FOREST GUARDIANS, a non-profit
New Mexico corporation, and
DEFENDERS OF WILDLIFE, a non-
profit Washington, D.C. corporation,

       Plaintiffs-Appellants,

v.

BRUCE BABBITT, Secretary of the
Interior,

       Defendant-Appellee.

No. 97-2370

Appeal from the United States District Court
for the District of New Mexico
(D.C. No. CIV 97-0453)

Matt Kenna, Kenna & Hickcox, Durango, Colorado, for Plaintiffs-Appellants.

James C. Kilbourne, Attorney, Department of Justice (Lois J. Schiffer, Assistant
Attorney General; John J. Kelly, United States Attorney; John W. Zavitz,
Assistant United States Attorney; Ellen J. Durkee, Attorney, Department of
Justice; and Warigia Bowman, Attorney, Department of Justice, with him on the
briefs), Washington, D.C., for Defendant-Appellee.

Before **PORFILIO**, **EBEL** and **KELLY**, Circuit Judges.

**EBEL**, Circuit Judge.

In 1991, the administrative process was set in motion to list the Rio Grande silvery minnow as an endangered species and designate its critical habitat under the Endangered Species Act of 1973 and its subsequent amendments ("ESA" or "Act"). In July 1994, the Secretary of the Interior ("Secretary") listed the fish as an endangered species, but failed to issue a rule regarding its critical habitat. By statute, a final rule designating the silvery minnow's critical habitat was due March 1, 1995. That date passed without a critical habitat designation, and to date the Secretary has not designated the critical habitat for the silvery minnow. On April 4, 1997, two environmental organizations brought an action in federal district court to compel the Secretary to designate the critical habitat for the silvery minnow within 30 days. The Secretary, while admitting that he had violated the timing requirements of the ESA, asked the district court to stay the action until October 1999. The Secretary explained that it was impossible for him to meet all of the ESA deadlines because of a backlog created by a 13-month spending moratorium imposed by Congress which lasted from April 1995 through April 1996. Despite the fact that the Secretary's duty to designate critical habitat inured before Congress enacted the moratorium and that the Secretary had not fulfilled his duty in the two-and-one-half years since the moratorium expired, the district court credited the Secretary's impossibility argument, denied the plaintiffs' motion to review agency action, and granted the Secretary's motion to

stay the case until October 1999. Because the Secretary failed to comply with a mandatory, non-discretionary duty unambiguously imposed by the ESA, and because the Administrative Procedure Act requires courts to compel agency action unlawfully withheld, we reverse the district court.

## I.  BACKGROUND

The Rio Grande silvery minnow (<u>Hybognathus amarus</u>) is a stout silver fish with emerald reflections reaching lengths of up to 3 ½ inches.  Historically, it was one of the most abundant and widespread fishes in the Rio Grande basin.  <u>See</u> Final Rule To List the Rio Grande Silvery Minnow as an Endangered Species, 59 Fed. Reg. 36, 988, 36,988 (1994) [hereinafter "Final Rule"].  Over the past 30 years, however, due in large part to dam construction and dewatering of a large percentage of its habitat, the silvery minnow's presence has been reduced to 5% of its historic range.  <u>See</u> <u>id.</u>  The fish can now be found only along a 170-mile stretch of the middle Rio Grande, extending from the Cochiti Dam, in Sandoval County, New Mexico to the headwaters of the Elephant Butte Reservoir, in Socorro County, New Mexico.  <u>See</u> <u>id.</u>

On March 1, 1993, the Fish and Wildlife Service[1] ("FSW" or "Service") published a proposed rule to list the Rio Grande silvery minnow as endangered and to designate its critical habitat.[2] See Proposed Rule to List the Rio Grande Silvery Minnow as Endangered, With Critical Habitat, 58 Fed. Reg. 11,821, 11,822 (1993). After publishing the proposed rule, the ESA required the Service to issue a final rule regarding the silvery minnow's endangered status and its critical habitat within one year — in this case, by March 1, 1994. See Endangered Species Act, 16 U.S.C. § 1533(b)(6)(A) [hereinafter "ESA"].

The Service failed to meet its March 1, 1994 deadline. Over four months later, on July 20, 1994, the Service published a final rule listing the Rio Grande

---

[1]The Fish and Wildlife Service is located in the Department of the Interior and the Secretary has delegated species listing and habitat designation authority to the Fish and Wildlife Service. See Brief of Appellee, at 5; see also 55 Fed. Reg. 26114, 26122 (1990).

[2]"Critical habitat" is defined under the ESA as:

(i) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and
(ii) specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 1533 of this title, upon a determination by the Secretary that such areas are essential for the conservation of the species.

16 U.S.C. § 1532(5)(A).

silvery minnow as an endangered species.  See Final Rule, 59 Fed. Reg. at 36,988.

In its July 20 final rule, the Service explained that it could not make a concurrent

designation of the silvery minnow's critical habitat as the ESA strongly

encourages.  See ESA, 16 U.S.C. § 1533(a)(3) ("The Secretary . . . to the

maximum extent prudent and determinable . . . shall, concurrently with making a

determination . . . that a species is an endangered species . . . designate any

habitat of such species which is then considered to be critical habitat . . . .").

Instead, the Service concluded that the silvery minnow's critical habitat was "not

then determinable," and thereby extended its deadline to make a critical habitat

determination under Section 4(b)(6)(C) of the Act.  See Final Rule, 59 Fed. Reg.

at 36,994.[3]  Accordingly, the Service announced that "[t]he final decision on

_____

[3]Section 4(b)(6)(C) of the ESA reads:

(C)  A final regulation designating critical habitat of an endangered species
or a threatened species shall be published concurrently with the final
regulation implementing the determination that such species is endangered
or threatened, unless the Secretary deems that —

. . .

(ii) critical habitat of such species is not then determinable, in which
case the Secretary, with respect to the proposed regulation to
designate such habitat, may extend the one-year period specified in
subparagraph (A) by not more than one additional year, but not later
than the close of such additional year the Secretary must publish a
final regulation, based on such data as may be available at that time,
designating, to the maximum extent prudent, such habitat.

(continued...)

- 5 -

designation of critical habitat for the Rio Grande silvery minnow must be made by March 1, 1995, pursuant to section 4(b)(6)(C)(ii) of the Act."[4] Id.  The March 1, 1995 deadline passed without action by the Service, and now, more than three-and-one-half years later, the Service still has not made a final determination of the silvery minnow's critical habitat.

On April 4, 1997, Forest Guardians and Defenders of Wildlife (together "plaintiffs") filed suit against the Secretary, alleging that his failure to designate the silvery minnow's critical habitat violated the ESA.  Plaintiffs sought both a declaration that the Secretary was in violation of the ESA and an injunction compelling the Secretary to issue a final rule on designation of critical habitat for the silvery minnow within 30 days of the court's order.  In his answer, the Secretary admitted his failure to comply with his statutory duty to designate critical habitat for the silvery minnow, but defended his inaction on the ground that "no resources are available at this time to complete a critical habitat determination for the silvery minnow."

---

[3](...continued)
ESA, 16 U.S.C. § 1533(b)(6)(C).

[4]In this litigation, the district court found, and the Secretary does not contest, that the final statutory deadline to make the critical habitat determination for the Rio Grande silvery minnow was March 1, 1995.  See Forest Guardians v. Babbitt, No. CIV 97-0453 JC/DJS (D.N.M. Oct. 23, 1997).

On July 14, 1997, plaintiffs filed a motion captioned Motion for Review of Agency Decision, seeking review of the Secretary's failure to issue a final decision on the silvery minnow's critical habitat. This motion expressly requested that the court declare the Secretary in violation of his non-discretionary ESA duties and order him to carry out his duties within 30 days. That same day, the Secretary filed his opposition to the plaintiffs' motion along with a motion to stay the proceedings until October 30, 1999.

The Secretary opposed plaintiffs' motion to compel a critical habitat designation essentially on the grounds of fiscal impracticability. The Secretary argued that a funding moratorium instituted by Congress in 1995 had prevented him from making any critical habitat determinations or listing any species as endangered or threatened,[5] thus creating an enormous backlog of overdue non-discretionary duties.

Beginning in April 1995 Congress passed a number of spending moratoria, prohibiting the Service from listing species as endangered or threatened and prohibiting the designation of critical habitats for species already listed.[6] This

---

[5]Listing duties and critical habitat designations are sometimes referred to collectively as Section 4 duties, because they emanate from § 4 of the Endangered Species Act of 1973 and amendments thereto. See Pub. L. No. 93-205, 87 Stat. 884, 886-89 (1973); Pub. L. No. 97-304, 96 Stat. 1411, 1411-13 (1982).

[6]On April 10, 1995, Congress passed the first such moratorium, Emergency Supplemental Appropriations and Rescissions for the Department of Defense to
(continued...)

moratorium on expenditures for critical habitat determinations lasted through September 30, 1995, the end of the Fiscal Year ("FY") 1995. From the beginning of FY 1996 — October 1, 1995 — until April 26, 1996, the moratorium in Pub. L. No. 104-6 was continued by over a dozen resolutions and the Acting Director of the Service was forced to reassign listing staff to other duties. See 61 Fed. Reg. 24,722, 24,723 (1996) (describing spending moratoria imposed by Congress and Service response). Because of the moratoria, between October 1995 and April 1996, the Service expended only $233,000 on the entire nationwide listing program — a modest sum compared to the nearly $4 million it received for the first six months of FY 1995.

On April 26, 1996, Congress passed an appropriations bill for the Department of the Interior for FY 1996. See Omnibus Consolidated Rescissions

---

[6](...continued)
Preserve and Enhance Military Readiness Act of 1995, Pub. L. No. 104-6, 109 Stat. 73, 86 (1995), which stated in pertinent part:

Of the funds made available under this heading in Public Law 103-322 —

(1) $1,500,000 are rescinded from the amounts available for making determinations whether a species is a threatened or endangered species and whether habitat is critical habitat under the [ESA]; and

(2) none of the remaining funds appropriated under that heading may be made available for making a final determination that a species is threatened or endangered or that habitat constitutes critical habitat (except a final determination that a species previously determined to be endangered is no longer endangered but continues to be threatened).

and Appropriations Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321 (1996). The bill continued the 1995 moratorium, but contained a provision permitting the President to waive the moratorium. President Clinton waived the moratorium the day he signed the bill into law. The appropriation bill provided the Service with approximately $4 million to carry out its listing and critical habitat designations for the balance of FY 1996.

Due to these budgetary restrictions, when the Service received its funding in April 1996, it was faced with a backlog of 243 proposed species listings on which it was required to make a final determination.[7] See 61 Fed. Reg. 24,722, 24,724 (1996). Concluding that it could not feasibly complete all of its Section 4 duties in a timely manner, the Service, after notice and comment, published a rule establishing a priority system for eliminating its backlog. See id. at 24,727-24,728. The Service dubbed its hierarchy the Final Listing Priority Guidance ("LPG").

The LPG established a three-tier system for eliminating the Service's backlog. Critical habitat designations were relegated to the third tier, based on the Service's conclusion that critical habitat designation provided only a limited

_____

[7]In addition, the Service had outstanding 182 candidate species whose conservation status needed determination, numerous court orders to take various actions under Section 4 of the ESA, and 57 petitions to list species under the ESA. See 61 Fed Reg. at 24,723.

increase in protection to a species already listed as endangered or threatened.  See 61 Fed. Reg. at 24,727-24,728.  Because the Service received only $5 million for Section 4 activities for FY 1997 — approximately $2.5 million less than President Clinton requested from Congress — the Service, again after notice and comment, extended the LPG.  See 61 Fed. Reg. 64,475, 64,479 (1996).[8]

At the beginning of FY 1998 — October 1, 1997 — Congress had not appropriated funds for the Service's listing program; thus, the program proceeded under a continuing resolution at FY 1997 listing levels.  In response to what it perceived to be continued inadequate funding, the Service extended the FY 1997 LPG into FY 1998.  See 62 Fed. Reg. 55,268, 55,269 (1997).  On November 14, 1997, Congress enacted the Department of the Interior's FY 1998 Appropriations Act.  See Department of the Interior and Related Agencies Appropriations Act, 1998, Pub. L. No. 105-83, 111 Stat. 1543 (1997).  Therein, Congress expressly limited spending on listings and critical habitat determinations to $5.19 million. See id. at 1547.  Again concluding that Congress' allocation was inadequate to accomplish all of its required duties, the Service extended its LPG through the remainder of FY 1998 and into FY 1999.  See 63 Fed. Reg. 25,502, 25,509

---

[8]The regulation extending the LPG reclassified some Section 4 activities and changed the three-tier system into a four-tier system.  See 61 Fed. Reg. at 64,479-64,480.  Critical habitat determinations were lowered to the fourth tier. See id. at 64,480.

(1998).[9]  The LPG is currently in place and governs the Service's choices as to which non-discretionary duties to perform and which to delay.

The district court recognized that "it is clear that the ESA has been violated in this case."  Forest Guardians v. Babbitt, No. CIV 97-0453 JC/DJS, at 4. However, the district court deferred to the Secretary's LPG, persuaded by the Secretary's claim of fiscal impossibility and the Service's argument that the LPG served the ESA's "overarching purposes" — "maximizing species protection and reversing the trends of extinction."  Id. at 5.  Thus, though the court "admonishe[d]" the Secretary to ensure that the silvery minnow's critical habitat was designated "as soon as fiscally possible," the district court denied plaintiffs' motion for review of agency decision and granted defendant's motion to stay proceedings until October 30, 1999.  See id. at 6.  Plaintiffs filed a timely notice of appeal to this court on November 12, 1997.

This case presents the question whether resource limitations can justify the Secretary's failure to comply with mandatory, non-discretionary duties imposed by the ESA.[10]  We hold that they cannot, and accordingly we reverse.

---

[9]This new LPG returned to the three-tier hierarchy, placing critical habitat determination as the lone duty in tier three.  See 63 Fed. Reg. at 25,510.

[10]While in Biodiversity Legal Foundation v. Babbitt, 146 F.3d 1249 (10th Cir. 1998), this court recognized the LPG as a valid hierarchy under which the Secretary may order his discretionary duties, we explicitly reserved the question of whether the Secretary may use the LPG as a basis to deviate from

(continued...)

## II. JURISDICTION

After an initial review, we ordered the parties to brief the issue whether the district court order is immediately appealable to this court. We now conclude that it is.

"[T]he courts of appeals shall have jurisdiction of appeals from . . . [i]nterlocutory orders of the district courts of the United States . . . or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions . . . ." 28 U.S.C. § 1292(a) (emphasis added). The Tenth Circuit has recognized "two strands of analysis" for § 1292(a)(1) appeals under which we have jurisdiction. See Utah State Dept. of Health v. Kennecott Corp., 14 F.3d 1489, 1496 (10th Cir. 1994). The first strand applies to orders regarding "express motions for injunctive relief" and the second applies to orders with the "practical effect" of disposing of a request for injunctive relief. See id. We believe the district court order is appealable under either analysis.

When plaintiffs' motion is read in conjunction with their complaint, it is clear that plaintiffs were seeking injunctive relief. First, in their complaint, plaintiffs expressly requested an "injunction" ordering the Secretary to "issue a

---

[10](...continued) congressionally-imposed mandatory duties. See id. at 1256 ("We note that the question of the 1997 LPG's validity where a violation of a mandatory provision of the ESA is alleged is not before us.").

final rule on designation of critical habitat for the minnow within 30 days of this Court's order." Likewise, although plaintiffs' motion before the district court was captioned "Motion for Review of Agency Decision," it too sought injunctive relief. The plaintiffs expressly requested that the district court "declare that the defendant violated his non-discretionary duty" and that the district court "order [the Secretary] to carry out [his duty to designate the critical habitat for the Rio Grande silvery minnow] within 30 days of the Court's order."

In short, plaintiffs have sought injunctive relief. Even though plaintiffs failed to label their motion in the district court as one for injunction, it is clear from the content of the motion that plaintiffs were seeking injunctive relief.[11] The district court's order denying that motion was an "interlocutory order expressly denying . . . an injunction [and] it fits squarely within the plain language of § 1292(a)(1) . . . ." Kennecott Corp., 14 F.3d at 1496.

Alternatively, we have jurisdiction because the district court's order had the "practical effect" of refusing plaintiffs' injunction. In order to have appellate jurisdiction under this second strand of analysis, the challenged order must: (1) have "the practical effect of refusing an injunction," (2) threaten a "'serious,

---

[11]The labels of the plaintiff and the district court cannot be dispositive of whether an injunction has been requested or denied. See 11A Wright et al., Federal Practice and Procedure § 2962, at 413 (1995) ("[A] district court may not avoid immediate review of its determination simply by failing to characterize or label its decision as one denying or granting injunctive relief.").

perhaps irreparable, consequence,'" and (3) be "'effectually challenged'" only by immediate appeal. Carson v. American Brands, Inc., 450 U.S. 79, 84 (1981) (citation omitted).

Here, the practical effect of the district court's order was to deny the injunctive relief sought by plaintiffs. Had plaintiffs' motion been granted, an injunction would have issued. See Oregon Natural Resources Council, Inc. v. Kantor, 99 F.3d 334, 337 (9th Cir. 1996) (holding that denial of motion for summary judgment was sufficient to establish first prong of Carson where it effectively denies or obviates the need for injunctive relief). The environmental organizations sought to compel the Secretary to comply with his statutorily-imposed duty within 30 days of a court order. The district court's denial of plaintiffs' motion and the accompanying grant of the Secretary's motion to stay proceedings until October 30, 1999 had the effect of denying plaintiffs' request for an order enjoining the Secretary to comply presently.

In addition, the consequences of denying plaintiffs' motion and staying proceedings for over 14 months threatens serious, perhaps irreparable, consequences regarding the continued vitality of the silvery minnow. Despite the Secretary's argument to the contrary, critical habitat designations serve to protect species vulnerable to extinction. Without a designated critical habitat, the ESA's requirement that "[e]ach Federal agency shall . . . insure that any [of its actions] is

not likely to . . . result in the destruction or adverse modification of [critical] habitat," 16 U.S.C. § 1536(a)(2), becomes unenforceable. Congress expressed its opinion regarding the importance of critical habitat designations by requiring, with limited exception, a contemporaneous designation of critical habitat at the time of listing a species as either endangered or threatened. See 16 U.S.C. § 1533(b)(6)(C). Delaying a decision on the Secretary's duties regarding designation of critical habitat — a designation already 3 ½ years overdue — for over a year more could result in continued and potentially irreparable loss of the silvery minnow.

Finally, immediate review in this court is necessary to challenge effectually the Secretary's inaction. Plaintiffs have no other recourse. Without review in this court, the action will be stayed until October 30, 1999.

Accordingly, we have jurisdiction to reach the merits of plaintiffs' appeal.

### III. MERITS

*A. Standard of Review.*

We review the district court's denial of plaintiffs' motion to compel agency action de novo.[12] See Webb v. Hodel, 878 F.2d 1252, 1254 (10th Cir. 1989). "We

---

[12]The Secretary argues that even if we view the district court's stay as a denial of a motion for injunctive relief — which we do — the standard governing
(continued...)

give no deference . . . to the legal or factual decisions of the district court."

Nazaraghaie v. INS, 102 F.3d 460, 463 (10th Cir. 1996).  In determining the

proper remedy for the Secretary's failure to comply with the ESA, we rely on the

standards of review provided in the Administrative Procedure Act ("APA").  See

Biodiversity Legal Foundation v. Babbitt, 146 F.3d 1249, 1252 (10th Cir. 1998).

*B. The Endangered Species Act.*

First, we consider whether the Secretary was under a statutorily-imposed

mandatory deadline to designate the critical habitat for the silvery minnow.  As

discussed above, with limited exceptions, the ESA requires the Secretary to take

final action on species listing and critical habitat designation within one year after

he publishes general notice as to a proposed rule, although the Secretary may

declare a one-year extension of time to designate critical habitat if certain criteria

are met.  See ESA, 16 U.S.C. § 1533(b)(6)(A).  Here, the Secretary published a

proposed rule to list the Rio Grande silvery minnow as endangered and to

designate its critical habitat on March 1, 1993.  See Proposed Rule to List the Rio

---

[12](...continued)
our review should be abuse of discretion.  The Secretary takes this standard from
Ute Indian Tribe of Unitah & Ouray Reservation v. Utah, 114 F.3d 1513, 1520
(10th Cir. 1997), cert. denied, 118 S. Ct. 1034 (1998).  However, Ute Indian Tribe
did not involve a request for an injunction against an agency coming under the
Administrative Procedure Act.  The cases cited herein demonstrate that the
Secretary misapprehends our review standard.

Grande Silvery Minnow as Endangered, With Critical Habitat, 58 Fed. Reg. 11821 (1993). Thus, a final rule or notice of a one-year extension respecting the critical habitat for the fish was due on March 1, 1994. On July 20, 1994, the Secretary, pursuant to 16 U.S.C. § 1533(b)(6)(C),[13] issued notice that the silvery minnow's habitat was "not then determinable," and extended the deadline for a final rule on critical habitat until March 1, 1995. See Final Rule, 59 Fed. Reg. at 36,994. Consequently, we have no problem concurring with the district court, the plaintiffs, and the Secretary himself, that the Secretary had a duty under the ESA to designate the silvery minnow's critical habitat by March 1, 1995, and that he has yet to fulfill that duty.

*C. The Administrative Procedure Act.*

Having determined that the Secretary violated his non-discretionary duty to issue a critical habitat designation for the Rio Grande silvery minnow, we now look to the APA to determine the proper remedy to be prescribed upon judicial review. The APA provides that "the reviewing court shall decide all relevant

---

[13]If the Secretary deems that a critical habitat is not determinable when a final rule regarding species status is issued, this section permits the Secretary to "extend the one-year period specified in subparagraph (A) by not more than one additional year, but not later than the close of such additional year the Secretary must publish a final regulation, based on such data as may be available at that time, designating, to the maximum extent prudent, such habitat." 15 U.S.C. §1533(b)(6)(C) (emphasis added).

questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court <u>shall</u> . . . <u>compel</u> agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1) (emphasis added); <u>see</u> <u>Mt. Emmons Mining Co. v. Babbitt</u>, 117 F.3d 1167, 1170 (10th Cir. 1997).

*1. "Shall" means shall.* The Supreme Court and this circuit have made clear that when a statute uses the word "shall," Congress has imposed a mandatory duty upon the subject of the command. <u>See</u> <u>United States v. Monsanto</u>, 491 U.S. 600, 607 (1989) (by using "shall" in civil forfeiture statute, "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied"); <u>Pierce v. Underwood</u>, 487 U.S. 552, 569-70 (1988) (Congress' use of "shall" in a housing subsidy statute constitutes "mandatory language"); <u>Barrentine v. Arkansas-Best Freight Sys., Inc.</u> 450 U.S. 728, 739 n.15 (1981) (same under Fair Labor Standards Act); <u>United States v. Myers</u>, 106 F.3d 936, 941 (10th Cir.) ("It is a basic canon of statutory construction that use of the word 'shall' [in 18 U.S.C. § 3553(f)] indicates mandatory intent."), <u>cert. denied</u>, 117 S.Ct. 2446 (1997); <u>see also</u> <u>Black's Law Dictionary</u> 1233 (5th ed. 1979) ("As used in statutes . . . [shall] is generally imperative or mandatory.").

Unpersuaded by the clear language of § 706 and the weight of authority interpreting the imperative nature of "shall," the Secretary argues that this court is not required to issue an injunction. Instead, the Secretary urges this court to use its equitable discretion to permit his continued non-compliance with the ESA, citing several Supreme Court opinions that hold that even in the face of a government statutory violation, the power to grant or deny injunctive relief rests in the sound discretion of the court. See Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 542 (1987); Weinberger v. Romero-Barcelo, 456 U.S. 305, 313 (1982); Tennessee Valley Authority v. Hill, 437 U.S. 153, 193 (1978). However, these cases also unmistakably hold that Congress may "restrict[] the court's jurisdiction in equity" by making injunctive relief mandatory for a violation. Weinberger, 456 U.S. at 313; see Amoco Prod. Co., 480 U.S. at 542-43 & n.9; see also TVA, 437 U.S. at 194.

While the Supreme Court has made clear that courts should not lightly infer Congress' intent to curtail the courts' traditional equitable power to exercise discretion in the granting of injunctive relief, the Court has likewise made clear Congress' power to curb the courts' discretion by clear expression. See Weinberger, 456 U.S. at 313 ("Of course, Congress may intervene and guide or control the exercise of the courts' discretion, but we do not lightly assume that Congress has intended to depart from established principles."). Through § 706

- 19 -

Congress has stated unequivocally that courts must compel agency action unlawfully withheld or unreasonably delayed.

Even in mandamus cases, which inherently involve court discretion, we have often spoken in strong, and occasionally even absolute, language with regard to the court's duty to enforce agency action mandated by Congress. "If, after studying the statute and its legislative history, the court determines that the defendant official has failed to discharge a duty which Congress intended him to perform, the court should compel performance, thus effectuating the congressional purpose." Estate of Smith v. Heckler, 747 F.2d 583, 591 (10th Cir. 1984) (emphasis added); see Mt. Emmons Mining Co., 117 F.3d at 1170 ("[A]s a reviewing court, we must 'compel agency action unlawfully withheld or unreasonably delayed.'" (emphasis added)); Marathon Oil Co. v. Lujan, 937 F.2d 498, 500 (10th Cir. 1991) ("Mandamus relief is an appropriate remedy to compel an administrative agency to act where it has failed to perform a nondiscretionary, ministerial duty. Administrative agencies do not possess the discretion to avoid discharging the duties that Congress intended them to perform." (citations omitted)); Health Sys. Agency of Oklahoma v. Norman, 589 F.2d 486, 492 (10th Cir. 1978) ("trial court must 'compel'" agency action unlawfully withheld (emphasis added)).

We believe our "shall"-means-shall approach has been implicitly recognized by the Ninth Circuit. In Environmental Defense Ctr. v. Babbitt, 73 F.3d 867 (9th

Cir. 1995), the Environmental Defense Center ("EDC") filed a suit to compel the

Secretary to make a final determination on a petition to list the California red-

legged frog as an endangered species, which the Secretary admitted he had failed

to do by the statutory deadline. While the court stopped short of compelling

immediate action, we believe the following passage indicates that it would have

done so, but for the then-existing congressional spending moratorium on listing

activities:

> On May 1, 1995, EDC filed the instant suit to compel the
> Secretary to make and publish a final determination. EDC would
> prevail except for the fact that between the time the Secretary failed
> to meet the deadline and the time EDC filed suit, Congress passed an
> appropriations bill which precluded the expenditure of fiscal year
> 1995 funds on specified activities under the ESA.

Id. at 869 (emphasis added). The Ninth Circuit held that the Secretary had

violated his non-discretionary duty to take final action on the California red-

legged frog by February 2, 1995. See id. at 872. However, the court recognized

that the appropriations rider prevented the Secretary from complying with ESA

deadlines. See id.

Notwithstanding the Ninth Circuit's statement that it would have compelled

the Secretary to act absent the moratorium, the Secretary argues that

Environmental Defense Center v. Babbitt supports his position that we should

excuse his present non-compliance based on resource limitations. He contends

that since the Ninth Circuit concluded both (1) that the moratorium did not modify

- 21 -

or repeal the Secretary's duties under the ESA, and (2) that a "lack of available appropriated funds prevent[ed] the Secretary from complying with the [ESA]," id. at 872, that the Ninth Circuit recognized the inadequate resources defense to the motion to compel agency action.[14] While the Secretary's argument highlights some of the ambiguity in Environmental Defense Center v. Babbitt, we accept the clear statement by the Ninth Circuit in that case that had the spending moratorium not been in effect at the time that the court rendered its decision, it would have affirmed the district court order compelling agency action. This conclusion is bolstered by the district court's disposition on remand. After a remand hearing held only 10 days after the congressional spending moratorium was lifted, the district court ordered the Secretary to "complete the listing of the red-legged frog"

_____

[14]We express serious doubt as to the first conclusion, although we need not decide it in this case. We note that when a later duly enacted law of Congress makes impossible compliance with duties imposed by earlier laws, we would impute to Congress knowledge of the earlier laws and the intent to modify them. See Morton v. Mancari, 417 U.S. 535, 550 (1974) ("[T]he only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable.").

As to the second conclusion, to the extent that the Ninth Circuit held that a court considering whether to compel an agency to comply with its mandatory, non-discretionary duties should consider available resources when deciding whether to enjoin the agency, we disagree. Of course, courts must consider resource availability; but since we believe our duty to compel agency action is controlled by 5 U.S.C. §706, which strips courts of their traditional tools of equity, we hold the agency defense of unavailable resources must be reserved as a defense against contempt if an injunction issues. See infra Section III.

- 22 -

within two weeks.  See Environmental Defense Ctr. v. Babbitt, CV-95-2867-R (C.D. Cal. May 6, 1996) (unreported order).

Consequently, we believe that Environmental Defense Center v. Babbitt supports our conclusion that if the Secretary unlawfully withheld agency action or unreasonably delayed it at a time when the moratorium was not in effect, we must compel the Secretary to perform the mandatory duties required by the ESA.  With our discretion so limited, we  now turn to whether the Secretary's failure to designate the silvery minnow's critical habitat within the statutory time frame constitutes agency action unlawfully withheld or unreasonably delayed.

2.  *"Unlawfully withheld" vs. "unreasonably delayed."*   Courts have given little attention to the distinction between agency action "unlawfully withheld" and agency action "unreasonably delayed" from the drafting of APA.  However, that distinction is important in this case because the discretion Congress took away from courts by using "shall" in the first portion of § 706(1) arguably could come back to the courts through Congress' use of the modifier "unreasonably" as applied to actions "delayed" (as opposed to actions "withheld") in the second portion of § 706(1).

As with all questions of statutory interpretation, we first look to the text of Congress' provisions.  Unfortunately, the ambiguity of  § 706 is the source of our

confusion. Section 706 merely sets out the alternative conditions under which a court must compel agency action — i.e., when agency action is "unlawfully withheld" or "unreasonably delayed." Moreover, neither the APA's other substantive provisions nor its structure cast light on the meaning of § 706.[15]

Further, notwithstanding the debate concerning the propriety of finding statutory meaning by reference to legislative history, the floor debates and committee reports attendant to the APA provide little guidance regarding any possible distinction between "unlawfully withheld" and "unreasonably delayed." The Senate Report accompanying the original APA explained only that the judicial review provisions "expressly recognize[] the right of properly interested parties to

---

[15]Nor can we find any guidance regarding a distinction in the rest of the United States Code. The terms "unlawfully withheld" and "unreasonably delayed" appear in only two sections of the Code besides the APA. These sections explicitly or in legislative history reference 5 U.S.C. §706 and provided no further clarification. In 1996, Congress amended the Federal Environmental Pesticide Control Act of 1972 as follows: "If the Administrator fails to notify an applicant within the period of time required under clause (i), the failure shall be considered an agency action unlawfully withheld or unreasonably delayed for purposes of judicial review under chapter 7 of Title 5." 7 U.S.C. § 136a (h)(3)(F)(ii). In 1989, Congress amended 38 U.S.C. § 7261(a)(2) to read: "(a) In any action brought under this chapter, the Court of Veterans Appeals . . . shall . . . compel action of the Secretary unlawfully withheld or unreasonably delayed." Prior to the amendment, 38 U.S.C. §7261(a)(2) only required the secretary to compel action "unlawfully withheld." The amendment added "or unreasonably delayed" to the end of the existing law to bring it into accord with 5 U.S.C. § 706(1). See 135 Cong. Rec. 30,627 (1989) (Explanatory Statement on the Compromise Agreement on H.R. 901, as amended).

compel agencies to act where they improvidently refuse to act."[16]  S. Rep. No. 79-752 (1945), reprinted in Administrative Procedure Act Legislative History, at 214 (1946).  Even the document which has been called the "Government's own most authoritative interpretation of the APA, the 1947 Attorney General's Manual on the Administrative Procedure Act (AG's Manual), which [the Court has] repeatedly given great weight," Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 218 (1988) (Scalia, J., concurring), fails to illuminate any distinction between "unlawfully withheld" and "unreasonably delayed."  With respect to § 10(e)(A) of the APA, the AG's Manual explains that:

> Clause (A) authorizing a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed", appears to be a particularized restatement of existing judicial practice under section 262 of the Judicial Code (28 U.S.C. 377). . . . Orders in the nature of a writ of mandamus have been employed to compel an administrative agency to act, Safeway Stores, Inc. v. Brown, [138 F.2d 278 (Emer. Ct. App. 1943)], . . . or to compel an agency or officer to perform a ministerial or non-discretionary act.  Clause (A) of section 10(e) was apparently intended to codify these judicial functions.
>
> Obviously, the clause does not purport to empower a court to substitute its discretion for that of an administrative agency . . . . However, as in Safeway Stores v. Brown, supra, a court may require an agency to take action upon a matter, without directing how it shall act.

Attorney General's Manual on the Administrative Procedure Act, at 108 (1947).

---

[16]The judicial review provision of the APA which became 5 U.S.C. § 706(1) originally appeared as § 10(e)(A) of the APA in 1946.

Thus, while the AG's Manual places the APA's judicial review provisions in their historical context and clarifies the courts' power to compel agency action, it sheds no light on the difference between agency action "unlawfully withheld" and "unreasonably delayed."[17]

In the absence of any clear statutory guidance we will simply apply the most straight forward common sense reading of these two phrases. Thus, if an agency has no concrete deadline establishing a date by which it must act, and instead is governed only by general timing provisions — such as the APA's general admonition that agencies conclude matters presented to them "within a reasonable time," see 5 U.S.C. § 555(b) — a court must compel only action that is delayed unreasonably. Conversely, when an entity governed by the APA fails to comply with a statutorily imposed absolute deadline, it has unlawfully withheld agency action and courts, upon proper application, must compel the agency to act.

Thus, the distinction between agency action "unlawfully withheld" and "unreasonably delayed" turns on whether Congress imposed a date-certain deadline

---

[17]The Safeway Stores case cited in the AG's Manual concluded that if the Administrator should unreasonably delay final action, a court may issue a writ of mandamus directing the Price Administrator to take action upon a pending request. That case appeared, without analysis, to conflate the concepts of "unlawfully withheld" and "unreasonably delayed," perhaps because the statute it was interpreting had both an absolute time period within which the Price Administrator must act and an additional requirement that the Administrator act "within a reasonable time" within the absolute maximum time fixed for action. See Safeway Stores, 138 F.2d at 278-80.

on agency action.  See Sierra Club v. Thomas, 828 F.2d 783, 794-95 & nn. 77-80 (D.C. Cir. 1987) (citing cases and drawing a distinction between an agency's refusal to comply with an absolute time requirement for action and an agency's more generalized unreasonable delay in acting).  In our opinion, when an agency is required to act — either by organic statute or by the APA — within an expeditious, prompt, or reasonable time, § 706 leaves in the courts the discretion to decide whether agency delay is unreasonable.  However, when Congress by organic statute sets a specific deadline for agency action, neither the agency nor any court has discretion.  The agency must act by the deadline.  If it withholds such timely action, a reviewing court must compel the action unlawfully withheld.  To hold otherwise would be an affront to our tradition of legislative supremacy and constitutionally separated powers.

In support of the contrary position, the Secretary argues that we should exercise our discretion and consider the context surrounding his legislative duty, as the District of Columbia Circuit did under similar circumstances in In re Barr Labs., Inc., 930 F.2d 72 (D.C. Cir. 1991).  In In re Barr, the court refused to order the Food and Drug Administration ("FDA") to comply with a statutorily-imposed 180-day deadline for approving or disapproving generic drug applications.  The court held that the "FDA's sluggish pace violate[d] a statutory deadline," but refused to issue the writ of mandamus sought by Barr Laboratories.  See id. at 73.

- 27 -

Without reference to § 706, the court explained that "[e]quitable relief, particularly mandamus, does not necessarily follow a finding of a violation." Id. at 74. The court then stated that: "[o]ur leading case in this area, TRAC, identified six principles that have helped courts determine when mandamus is an appropriate remedy for agency delay . . . ." Id.[18] Dismissing the import of Congress' deadline, the court concluded that "a finding that delay is unreasonable does not, alone, justify judicial intervention." Id. at 75.

In light of the clear command of § 706, we cannot agree. Section 706 requires that a reviewing court "shall compel agency action . . . unreasonably delayed," and despite the In re Barr court's contrary conclusion, we believe that once a court deems agency delay unreasonable, it must compel agency action.

_____

[18]The six factors the District of Columbia recognized in Telecommunications Research Action Ctr. v. FCC, 750 F.2d 70, 80 (D.C. Cir. 1984) ["TRAC"], are as follows:

(1) the time agencies take to make decisions must be governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"

Neither TRAC nor any of the cases it relied on to "discern the hexagonal contours of a standard" involved agency inaction in the face of a mandatory statutory deadline.[19]  TRAC, 750 F.2d at 80.  However helpful the hexagonal standard of TRAC may be when considering a discretionary time schedule, we decline to apply it to the Secretary's failure to designate the critical habitat for the silvery minnow where Congress has established a specific, non-discretionary time within which the agency must act.  When an agency fails to meet a concrete statutory deadline, it has unlawfully withheld agency action.

## IV.  REMEDY

---

[19]The FCC delay at issue in TRAC was not governed by any mandatory deadline.  Instead, the only timing requirement Congress imposed on the FCC was the general APA mandate that agencies decide matters within a reasonable time.  See id. at 79.  Moreover, none of the cases on which TRAC relies involves mandatory agency deadlines.  See Public Citizen Health Research Group v. FDA, 740 F.2d 21, 32 (D.C. Cir. 1984) (relying on APA requirement that agency "proceed to conclude a matter presented to it within a reasonable time" (quotation omitted)); Potomac Elec. Power Co. v. ICC, 702 F.2d 1026, 1034 (D.C. Cir.) (statute required ICC to "act in a timely manner"), supplemented by, 705 F.2d 1343 (D.C. Cir. 1983); Public Citizen Health Research Group v. Auchter, 702 F.2d 1150, 1158 (D.C. Cir. 1983) (ordering agency action after a finding that rulemaking was "unreasonably delayed" based in part on APA's requirement that agency act "within a reasonable time"); MCI Telecomms. Corp. v. FCC, 627 F.2d 322, 340 (D.C. Cir. 1980) (statute requiring FCC ratemaking "within a reasonable time"; Blankenship v. Secretary of HEW, 587 F.2d 329, 333 (6th Cir. 1978) (relying in part on APA's general "reasonable time" requirement).

The Secretary concedes that he failed to perform a non-discretionary duty, but urges us to excuse his failure on the basis of resource limitations and the impossibility of compliance due to the moratorium and insufficient monetary allocations since its expiration.

We are not unsympathetic to the Secretary's practical predicament. Moreover, we respect the Secretary's goal, reflected in the LPG, of prioritizing duties in order to achieve the greatest conservation benefit for the greatest number of species, instead of allowing those decisions to be driven by the exigencies of litigation. See 61 Fed. Reg. 24722, 24723-24 (1996).

While we appreciate the Secretary's objective and the difficult position in which Congress has placed him, we believe his impossibility argument is premature. The Secretary's impossibility defense (based on a generalized claim of inadequate resources) hypothetically could arise at three distinct junctures in the litigation. First, the inadequate resource argument could arise at the duty stage; essentially the claim would be that Congress' inadequate appropriations relieve the Secretary of his non-discretionary duties under the ESA. This is essentially a "repeal by implication" argument, or more precisely, a "suspension by implication" argument. However, repeals (or suspension) of legislation by implication are disfavored, especially "when the claimed repeal rests solely on an Appropriations

Act."[20]  Tennessee Valley Authority v. Hill, 437 U.S. 153, 190 (1978); cf. United

States v. United Continental Tuna Corp., 425 U.S. 164, 168 (1976) (It is "a

cardinal principle of statutory construction that repeals by implication are not

favored." (internal quotation omitted)).  Wisely, the Secretary does not press the

argument that inadequate congressional appropriations relieved him of his ESA

duties.  We could not accept that argument if it had been raised, especially in light

of the fact that the specific statutory date by which the Secretary was required to

designate the critical habitat for the silvery minnow had already passed one month

before the moratorium was enacted, and the Secretary has continued to ignore that

clear statutory deadline for more than two-and-one-half years since the moratorium

has been lifted.

Second, the inadequate resources defense could arise at the remedy stage;

the claim would be that notwithstanding the Secretary's failure to perform a

mandatory duty, lack of resources should cause this court to disregard the

mandated statutory remedy.  The Secretary does advance this argument, but in

light of the lengthy discussion above, we cannot accept it.  In sum, we hold that

[20]We distinguish the present circumstances from those in effect during the moratorium.  While the express congressional moratorium was in effect, that congressional enactment constituted an express suspension of the Secretary's listing responsibilities under the ESA.  However, once the moratorium expired, the Secretary can no longer point to any extant legislation expressly modifying his duties under the ESA.

Congress, through 5 U.S.C. § 706, has explicitly removed from the courts the traditional equity balancing that ordinarily attends decisions whether to issue injunctions. In the face of Congress' clear command, the Secretary's inadequate resource argument must fail with respect to the appropriate remedy. Section 706 requires us to compel the unlawfully withheld agency action.

Third, the inadequate resources defense could arise at the contempt stage, as a traditional impossibility defense at any subsequent contempt proceeding that may occur if the Secretary fails to comply with an order enjoining him to designate the critical habitat by a time certain. See United States v. Rylander, 460 U.S. 752, 757 (1983) ("In a civil contempt proceeding . . . a defendant may assert a present inability to comply with the order in question."); Donovan v. Burgett Greenhouses, Inc., 759 F.2d 1483, 1486 (10th Cir. 1985) ("the defendant could avoid a contempt adjudication by showing through clear and convincing evidence that he was unable to meet the requirements of the injunction"); NRDC v. Train, 510 F.2d 692, 713 (D.C. Cir. 1975) (noting, with respect to the Administrator of EPA claiming inadequate resources to comply with statutory duty, that "[t]he sound discretion of an equity court does not embrace enforcement through contempt of a party's duty to comply with an order that calls him to do an impossibility"(quotation omitted)). While the Secretary's historic practice and oral assurance during argument convince us that the Secretary will comply with court orders, we note that in a

- 32 -

contempt proceeding, if one should occur, the Secretary will have the opportunity of proving impossibility.  See Donovan, 759 F.2d at 1486.

## V.  CONCLUSION

We hold that the Secretary violated his non-discretionary duty by failing to designate the critical habitat for the Rio Grande silvery minnow by the statutory deadline.  After all the permissible delays and extensions, the ESA required the Secretary to publish a final critical habitat designation by March 1, 1995.  This preceded any appropriations cutback or moratorium on spending.  Moreover, the moratorium on funding activities essential for making critical habitat designations ended well over two years ago.  In sum, the Secretary unlawfully withheld agency action here, and we are required by § 706 to compel the Secretary to act.

That said, we are left to work out the details.  Concerned by the Secretary's delay and the prospect of more delay if the case is remanded to the district court, plaintiffs ask this court to order the Secretary to complete the critical habitat determination within 30 days.  In support of this remedy, plaintiffs cite nine district court orders requiring the Secretary to comply with statutory obligations, within between 5 and 120 days.  The plaintiffs, however, cite no case in which a circuit court has set the deadline for compliance.

While we hold that the Secretary must be ordered to comply with his statutory duty to publish a final regulation regarding designation of the critical habitat for the silvery minnow without regard to his preferred priorities, any order now to impose a new deadline for compliance must consider what work is necessary to publish the final rule and how quickly that can be accomplished. Accordingly, we remand the case to the district court with instructions to order the Secretary to issue a final critical habitat designation for the silvery minnow as soon as possible, without regard to the Secretary's other priorities under the ESA.

For guidance, we refer the district court to the proceedings in Environmental Defense Center v. Babbitt, 73 F.3d 867 (9th Cir. 1995). There, in a case decided during the moratorium, the Ninth Circuit held that the Secretary violated his nondiscretionary duties to take final action on the California red-legged frog, but remanded to the district court to specify the time for compliance with the ESA after appropriated funds became available. See id. at 872. At a hearing which took place only 10 days after the moratorium was lifted, the district court ordered the Secretary to list the red-legged frog within 14 days. See Environmental Defense Center v. Babbitt, CV-95-2867-R, (D. C. Cal. May 6, 1996), Appellant's Appendix, at 145.

We REVERSE the district court's denial of plaintiffs' motion to review agency action, VACATE the stay order, and REMAND to the district court to

- 34 -

order the Secretary to publish, <u>as soon as possible</u>, "a final regulation, based on such data as may be available at that time, designating, to the maximum extent prudent," the critical habitat for the Rio Grande silvery minnow, as is required by 16 U.S.C. § 1533(b)(6)(C)(ii).

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 22 1998**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

FOREST GUARDIANS, a non-profit
New Mexico corporation, and
DEFENDERS OF WILDLIFE, a non-
profit Washington, D.C. corporation,

      Plaintiffs-Appellants,

v.

BRUCE BABBITT, Secretary of the
Interior,

      Defendant-Appellee.

No. 97-2370

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. CIV-97-0453-JC)**

---

Matt Kenna, Kenna & Hickcox, Durango, Colorado, for Plaintiffs-Appellants.

James C. Kilbourne, Attorney, Department of Justice (Lois J. Schiffer, Assistant
Attorney General; John J. Kelly, United States Attorney; John W. Zavitz,
Assistant United States Attorney; Ellen J. Durkee, Attorney, Department of
Justice; and Warigia Bowman, Attorney, Department of Justice, with him on the
briefs), Washington, D.C., for Defendant-Appellee.

---

Before **PORFILIO**, **EBEL** and **KELLY**, Circuit Judges.

---

**EBEL**, Circuit Judge.

In 1991, the administrative process was set in motion to list the Rio Grande silvery minnow as an endangered species and designate its critical habitat under the Endangered Species Act of 1973 and its subsequent amendments ("ESA" or "Act"). In July 1994, the Secretary of the Interior ("Secretary") listed the fish as an endangered species, but failed to issue a rule regarding its critical habitat. By statute, a final rule designating the silvery minnow's critical habitat was due March 1, 1995. That date passed without a critical habitat designation, and to date the Secretary has not designated the critical habitat for the silvery minnow. On April 4, 1997, two environmental organizations brought an action in federal district court to compel the Secretary to designate the critical habitat for the silvery minnow within 30 days. The Secretary, while admitting that he had violated the timing requirements of the ESA, asked the district court to stay the action until October 1999. The Secretary explained that it was impossible for him to meet all of the ESA deadlines because of a backlog created by a 13-month spending moratorium imposed by Congress which lasted from April 1995 through April 1996. Despite the fact that the Secretary's duty to designate critical habitat inured before Congress enacted the moratorium and that the Secretary had not fulfilled his duty in the two-and-one-half years since the moratorium expired, the district court credited the Secretary's impossibility argument, denied the plaintiffs' motion to review agency action, and granted the Secretary's motion to

stay the case until October 1999. Because the Secretary failed to comply with a mandatory, non-discretionary duty unambiguously imposed by the ESA, and because the Administrative Procedure Act requires courts to compel agency action unlawfully withheld, we reverse the district court.

## I. BACKGROUND

The Rio Grande silvery minnow (Hybognathus amarus) is a stout silver fish with emerald reflections reaching lengths of up to 3 ½ inches. Historically, it was one of the most abundant and widespread fishes in the Rio Grande basin. See Final Rule To List the Rio Grande Silvery Minnow as an Endangered Species, 59 Fed. Reg. 36, 988, 36,988 (1994) [hereinafter "Final Rule"]. Over the past 30 years, however, due in large part to dam construction and dewatering of a large percentage of its habitat, the silvery minnow's presence has been reduced to 5% of its historic range. See id. The fish can now be found only along a 170-mile stretch of the middle Rio Grande, extending from the Cochiti Dam, in Sandoval County, New Mexico to the headwaters of the Elephant Butte Reservoir, in Socorro County, New Mexico. See id.

On March 1, 1993, the Fish and Wildlife Service[1] ("FSW" or "Service") published a proposed rule to list the Rio Grande silvery minnow as endangered and to designate its critical habitat.[2] See Proposed Rule to List the Rio Grande Silvery Minnow as Endangered, With Critical Habitat, 58 Fed. Reg. 11,821, 11,822 (1993). After publishing the proposed rule, the ESA required the Service to issue a final rule regarding the silvery minnow's endangered status and its critical habitat within one year — in this case, by March 1, 1994. See Endangered Species Act, 16 U.S.C. § 1533(b)(6)(A) [hereinafter "ESA"].

The Service failed to meet its March 1, 1994 deadline. Over four months later, on July 20, 1994, the Service published a final rule listing the Rio Grande

---

[1]The Fish and Wildlife Service is located in the Department of the Interior and the Secretary has delegated species listing and habitat designation authority to the Fish and Wildlife Service. See Brief of Appellee, at 5; see also 55 Fed. Reg. 26114, 26122 (1990).

[2]"Critical habitat" is defined under the ESA as:

> (i) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and
> (ii) specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 1533 of this title, upon a determination by the Secretary that such areas are essential for the conservation of the species.

16 U.S.C. § 1532(5)(A).

silvery minnow as an endangered species.  See Final Rule, 59 Fed. Reg. at 36,988.

In its July 20 final rule, the Service explained that it could not make a concurrent

designation of the silvery minnow's critical habitat as the ESA strongly

encourages.  See ESA, 16 U.S.C. § 1533(a)(3) ("The Secretary . . . to the

maximum extent prudent and determinable . . . shall, concurrently with making a

determination . . . that a species is an endangered species . . . designate any

habitat of such species which is then considered to be critical habitat . . . .").

Instead, the Service concluded that the silvery minnow's critical habitat was "not

then determinable," and thereby extended its deadline to make a critical habitat

determination under Section 4(b)(6)(C) of the Act.  See Final Rule, 59 Fed. Reg.

at 36,994.[3]  Accordingly, the Service announced that "[t]he final decision on

_____

[3]Section 4(b)(6)(C) of the ESA reads:

(C)  A final regulation designating critical habitat of an endangered species or a threatened species shall be published concurrently with the final regulation implementing the determination that such species is endangered or threatened, unless the Secretary deems that —

. . .

(ii) critical habitat of such species is not then determinable, in which case the Secretary, with respect to the proposed regulation to designate such habitat, may extend the one-year period specified in subparagraph (A) by not more than one additional year, but not later than the close of such additional year the Secretary must publish a final regulation, based on such data as may be available at that time, designating, to the maximum extent prudent, such habitat.

(continued...)

- 5 -

designation of critical habitat for the Rio Grande silvery minnow must be made by March 1, 1995, pursuant to section 4(b)(6)(C)(ii) of the Act."[4] Id. The March 1, 1995 deadline passed without action by the Service, and now, more than three-and-one-half years later, the Service still has not made a final determination of the silvery minnow's critical habitat.

On April 4, 1997, Forest Guardians and Defenders of Wildlife (together "plaintiffs") filed suit against the Secretary, alleging that his failure to designate the silvery minnow's critical habitat violated the ESA. Plaintiffs sought both a declaration that the Secretary was in violation of the ESA and an injunction compelling the Secretary to issue a final rule on designation of critical habitat for the silvery minnow within 30 days of the court's order. In his answer, the Secretary admitted his failure to comply with his statutory duty to designate critical habitat for the silvery minnow, but defended his inaction on the ground that "no resources are available at this time to complete a critical habitat determination for the silvery minnow."

---

[3](...continued)
ESA, 16 U.S.C. § 1533(b)(6)(C).

[4]In this litigation, the district court found, and the Secretary does not contest, that the final statutory deadline to make the critical habitat determination for the Rio Grande silvery minnow was March 1, 1995. See Forest Guardians v. Babbitt, No. CIV 97-0453 JC/DJS (D.N.M. Oct. 23, 1997).

On July 14, 1997, plaintiffs filed a motion captioned Motion for Review of Agency Decision, seeking review of the Secretary's failure to issue a final decision on the silvery minnow's critical habitat. This motion expressly requested that the court declare the Secretary in violation of his non-discretionary ESA duties and order him to carry out his duties within 30 days. That same day, the Secretary filed his opposition to the plaintiffs' motion along with a motion to stay the proceedings until October 30, 1999.

The Secretary opposed plaintiffs' motion to compel a critical habitat designation essentially on the grounds of fiscal impracticability. The Secretary argued that a funding moratorium instituted by Congress in 1995 had prevented him from making any critical habitat determinations or listing any species as endangered or threatened,[5] thus creating an enormous backlog of overdue non-discretionary duties.

Beginning in April 1995 Congress passed a number of spending moratoria, prohibiting the Service from listing species as endangered or threatened and prohibiting the designation of critical habitats for species already listed.[6] This

_____

[5]Listing duties and critical habitat designations are sometimes referred to collectively as Section 4 duties, because they emanate from § 4 of the Endangered Species Act of 1973 and amendments thereto. See Pub. L. No. 93-205, 87 Stat. 884, 886-89 (1973); Pub. L. No. 97-304, 96 Stat. 1411, 1411-13 (1982).

[6]On April 10, 1995, Congress passed the first such moratorium, Emergency Supplemental Appropriations and Rescissions for the Department of Defense to

(continued...)

moratorium on expenditures for critical habitat determinations lasted through September 30, 1995, the end of the Fiscal Year ("FY") 1995.  From the beginning of FY 1996 — October 1, 1995 — until April 26, 1996, the moratorium in Pub. L. No. 104-6 was continued by over a dozen resolutions and the Acting Director of the Service was forced to reassign listing staff to other duties.  See 61 Fed. Reg. 24,722, 24,723 (1996) (describing spending moratoria imposed by Congress and Service response).  Because of the moratoria, between October 1995 and April 1996, the Service expended only $233,000 on the entire nationwide listing program — a modest sum compared to the nearly $4 million it received for the first six months of FY 1995.

On April 26, 1996, Congress passed an appropriations bill for the Department of the Interior for FY 1996.  See Omnibus Consolidated Rescissions

---

[6](...continued)
Preserve and Enhance Military Readiness Act of 1995, Pub. L. No. 104-6, 109 Stat. 73, 86 (1995), which stated in pertinent part:

Of the funds made available under this heading in Public Law 103-322 —

(1) $1,500,000 are rescinded from the amounts available for making determinations whether a species is a threatened or endangered species and whether habitat is critical habitat under the [ESA]; and

(2) none of the remaining funds appropriated under that heading may be made available for making a final determination that a species is threatened or endangered or that habitat constitutes critical habitat (except a final determination that a species previously determined to be endangered is no longer endangered but continues to be threatened).

and Appropriations Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321 (1996). The bill continued the 1995 moratorium, but contained a provision permitting the President to waive the moratorium. President Clinton waived the moratorium the day he signed the bill into law. The appropriation bill provided the Service with approximately $4 million to carry out its listing and critical habitat designations for the balance of FY 1996.

Due to these budgetary restrictions, when the Service received its funding in April 1996, it was faced with a backlog of 243 proposed species listings on which it was required to make a final determination.[7] See 61 Fed. Reg. 24,722, 24,724 (1996). Concluding that it could not feasibly complete all of its Section 4 duties in a timely manner, the Service, after notice and comment, published a rule establishing a priority system for eliminating its backlog. See id. at 24,727-24,728. The Service dubbed its hierarchy the Final Listing Priority Guidance ("LPG").

The LPG established a three-tier system for eliminating the Service's backlog. Critical habitat designations were relegated to the third tier, based on the Service's conclusion that critical habitat designation provided only a limited

---

[7]In addition, the Service had outstanding 182 candidate species whose conservation status needed determination, numerous court orders to take various actions under Section 4 of the ESA, and 57 petitions to list species under the ESA. See 61 Fed Reg. at 24,723.

increase in protection to a species already listed as endangered or threatened. See 61 Fed. Reg. at 24,727-24,728. Because the Service received only $5 million for Section 4 activities for FY 1997 — approximately $2.5 million less than President Clinton requested from Congress — the Service, again after notice and comment, extended the LPG. See 61 Fed. Reg. 64,475, 64,479 (1996).[8]

At the beginning of FY 1998 — October 1, 1997 — Congress had not appropriated funds for the Service's listing program; thus, the program proceeded under a continuing resolution at FY 1997 listing levels. In response to what it perceived to be continued inadequate funding, the Service extended the FY 1997 LPG into FY 1998. See 62 Fed. Reg. 55,268, 55,269 (1997). On November 14, 1997, Congress enacted the Department of the Interior's FY 1998 Appropriations Act. See Department of the Interior and Related Agencies Appropriations Act, 1998, Pub. L. No. 105-83, 111 Stat. 1543 (1997). Therein, Congress expressly limited spending on listings and critical habitat determinations to $5.19 million. See id. at 1547. Again concluding that Congress' allocation was inadequate to accomplish all of its required duties, the Service extended its LPG through the remainder of FY 1998 and into FY 1999. See 63 Fed. Reg. 25,502, 25,509

---

[8]The regulation extending the LPG reclassified some Section 4 activities and changed the three-tier system into a four-tier system. See 61 Fed. Reg. at 64,479-64,480. Critical habitat determinations were lowered to the fourth tier. See id. at 64,480.

(1998).[9]  The LPG is currently in place and governs the Service's choices as to which non-discretionary duties to perform and which to delay.

The district court recognized that "it is clear that the ESA has been violated in this case."  Forest Guardians v. Babbitt, No. CIV 97-0453 JC/DJS, at 4. However, the district court deferred to the Secretary's LPG, persuaded by the Secretary's claim of fiscal impossibility and the Service's argument that the LPG served the ESA's "overarching purposes" — "maximizing species protection and reversing the trends of extinction."  Id. at 5.  Thus, though the court "admonishe[d]" the Secretary to ensure that the silvery minnow's critical habitat was designated "as soon as fiscally possible," the district court denied plaintiffs' motion for review of agency decision and granted defendant's motion to stay proceedings until October 30, 1999.  See id. at 6.  Plaintiffs filed a timely notice of appeal to this court on November 12, 1997.

This case presents the question whether resource limitations can justify the Secretary's failure to comply with mandatory, non-discretionary duties imposed by the ESA.[10]  We hold that they cannot, and accordingly we reverse.

_____

[9]This new LPG returned to the three-tier hierarchy, placing critical habitat determination as the lone duty in tier three.  See 63 Fed. Reg. at 25,510.

[10]While in Biodiversity Legal Foundation v. Babbitt, 146 F.3d 1249 (10th Cir. 1998), this court recognized the LPG as a valid hierarchy under which the Secretary may order his discretionary duties, we explicitly reserved the question of whether the Secretary may use the LPG as a basis to deviate from

(continued...)

- 11 -

## II. JURISDICTION

After an initial review, we ordered the parties to brief the issue whether the district court order is immediately appealable to this court.  We now conclude that it is.

"[T]he courts of appeals shall have jurisdiction of appeals from . . . [i]nterlocutory orders of the district courts of the United States . . . or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions . . . ."  28 U.S.C. § 1292(a) (emphasis added).  The Tenth Circuit has recognized "two strands of analysis" for § 1292(a)(1) appeals under which we have jurisdiction.  See Utah State Dept. of Health v. Kennecott Corp., 14 F.3d 1489, 1496 (10th Cir. 1994).  The first strand applies to orders regarding "express motions for injunctive relief" and the second applies to orders with the "practical effect" of disposing of a request for injunctive relief.  See id.  We believe the district court order is appealable under either analysis.

When plaintiffs' motion is read in conjunction with their complaint, it is clear that plaintiffs were seeking injunctive relief.  First, in their complaint, plaintiffs expressly requested an "injunction" ordering the Secretary to "issue a

---

[10](...continued)
congressionally-imposed mandatory duties.  See id. at 1256 ("We note that the question of the 1997 LPG's validity where a violation of a mandatory provision of the ESA is alleged is not before us.").

- 12 -

final rule on designation of critical habitat for the minnow within 30 days of this Court's order." Likewise, although plaintiffs' motion before the district court was captioned "Motion for Review of Agency Decision," it too sought injunctive relief. The plaintiffs expressly requested that the district court "declare that the defendant violated his non-discretionary duty" and that the district court "order [the Secretary] to carry out [his duty to designate the critical habitat for the Rio Grande silvery minnow] within 30 days of the Court's order."

In short, plaintiffs have sought injunctive relief. Even though plaintiffs failed to label their motion in the district court as one for injunction, it is clear from the content of the motion that plaintiffs were seeking injunctive relief.[11] The district court's order denying that motion was an "interlocutory order expressly denying . . . an injunction [and] it fits squarely within the plain language of § 1292(a)(1) . . . ." Kennecott Corp., 14 F.3d at 1496.

Alternatively, we have jurisdiction because the district court's order had the "practical effect" of refusing plaintiffs' injunction. In order to have appellate jurisdiction under this second strand of analysis, the challenged order must: (1) have "the practical effect of refusing an injunction," (2) threaten a "'serious,

_____

[11]The labels of the plaintiff and the district court cannot be dispositive of whether an injunction has been requested or denied. See 11A Wright et al., Federal Practice and Procedure § 2962, at 413 (1995) ("[A] district court may not avoid immediate review of its determination simply by failing to characterize or label its decision as one denying or granting injunctive relief.").

- 13 -

perhaps irreparable, consequence,'" and (3) be "'effectually challenged'" only by immediate appeal. Carson v. American Brands, Inc., 450 U.S. 79, 84 (1981) (citation omitted).

Here, the practical effect of the district court's order was to deny the injunctive relief sought by plaintiffs. Had plaintiffs' motion been granted, an injunction would have issued. See Oregon Natural Resources Council, Inc. v. Kantor, 99 F.3d 334, 337 (9th Cir. 1996) (holding that denial of motion for summary judgment was sufficient to establish first prong of Carson where it effectively denies or obviates the need for injunctive relief). The environmental organizations sought to compel the Secretary to comply with his statutorily-imposed duty within 30 days of a court order. The district court's denial of plaintiffs' motion and the accompanying grant of the Secretary's motion to stay proceedings until October 30, 1999 had the effect of denying plaintiffs' request for an order enjoining the Secretary to comply presently.

In addition, the consequences of denying plaintiffs' motion and staying proceedings for over 14 months threatens serious, perhaps irreparable, consequences regarding the continued vitality of the silvery minnow. Despite the Secretary's argument to the contrary, critical habitat designations serve to protect species vulnerable to extinction. Without a designated critical habitat, the ESA's requirement that "[e]ach Federal agency shall . . . insure that any [of its actions] is

not likely to . . . result in the destruction or adverse modification of [critical] habitat," 16 U.S.C. § 1536(a)(2), becomes unenforceable. Congress expressed its opinion regarding the importance of critical habitat designations by requiring, with limited exception, a contemporaneous designation of critical habitat at the time of listing a species as either endangered or threatened. See 16 U.S.C. § 1533(b)(6)(C). Delaying a decision on the Secretary's duties regarding designation of critical habitat — a designation already 3 ½ years overdue — for over a year more could result in continued and potentially irreparable loss of the silvery minnow.

Finally, immediate review in this court is necessary to challenge effectually the Secretary's inaction. Plaintiffs have no other recourse. Without review in this court, the action will be stayed until October 30, 1999.

Accordingly, we have jurisdiction to reach the merits of plaintiffs' appeal.

III. MERITS

*A. Standard of Review.*

We review the district court's denial of plaintiffs' motion to compel agency action de novo.[12] See Webb v. Hodel, 878 F.2d 1252, 1254 (10th Cir. 1989). "We

---

[12]The Secretary argues that even if we view the district court's stay as a denial of a motion for injunctive relief — which we do — the standard governing
(continued...)

- 15 -

give no deference . . . to the legal or factual decisions of the district court."

Nazaraghaie v. INS, 102 F.3d 460, 463 (10th Cir. 1996).  In determining the

proper remedy for the Secretary's failure to comply with the ESA, we rely on the

standards of review provided in the Administrative Procedure Act ("APA").  See

Biodiversity Legal Foundation v. Babbitt, 146 F.3d 1249, 1252 (10th Cir. 1998).

*B. The Endangered Species Act.*

First, we consider whether the Secretary was under a statutorily-imposed

mandatory deadline to designate the critical habitat for the silvery minnow.  As

discussed above, with limited exceptions, the ESA requires the Secretary to take

final action on species listing and critical habitat designation within one year after

he publishes general notice as to a proposed rule, although the Secretary may

declare a one-year extension of time to designate critical habitat if certain criteria

are met.  See ESA, 16 U.S.C. § 1533(b)(6)(A).  Here, the Secretary published a

proposed rule to list the Rio Grande silvery minnow as endangered and to

designate its critical habitat on March 1, 1993.  See Proposed Rule to List the Rio

---

[12](...continued)
our review should be abuse of discretion.  The Secretary takes this standard from
Ute Indian Tribe of Unitah & Ouray Reservation v. Utah, 114 F.3d 1513, 1520
(10th Cir. 1997), cert. denied, 118 S. Ct. 1034 (1998).  However, Ute Indian Tribe
did not involve a request for an injunction against an agency coming under the
Administrative Procedure Act.  The cases cited herein demonstrate that the
Secretary misapprehends our review standard.

Grande Silvery Minnow as Endangered, With Critical Habitat, 58 Fed. Reg. 11821 (1993). Thus, a final rule or notice of a one-year extension respecting the critical habitat for the fish was due on March 1, 1994. On July 20, 1994, the Secretary, pursuant to 16 U.S.C. § 1533(b)(6)(C),[13] issued notice that the silvery minnow's habitat was "not then determinable," and extended the deadline for a final rule on critical habitat until March 1, 1995. See Final Rule, 59 Fed. Reg. at 36,994. Consequently, we have no problem concurring with the district court, the plaintiffs, and the Secretary himself, that the Secretary had a duty under the ESA to designate the silvery minnow's critical habitat by March 1, 1995, and that he has yet to fulfill that duty.

## C. The Administrative Procedure Act.

Having determined that the Secretary violated his non-discretionary duty to issue a critical habitat designation for the Rio Grande silvery minnow, we now look to the APA to determine the proper remedy to be prescribed upon judicial review. The APA provides that "the reviewing court shall decide all relevant

---

[13]If the Secretary deems that a critical habitat is not determinable when a final rule regarding species status is issued, this section permits the Secretary to "extend the one-year period specified in subparagraph (A) by not more than one additional year, but not later than the close of such additional year the Secretary must publish a final regulation, based on such data as may be available at that time, designating, to the maximum extent prudent, such habitat." 15 U.S.C. §1533(b)(6)(C) (emphasis added).

questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.  The reviewing court <u>shall</u> . . . <u>compel</u> agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1) (emphasis added); <u>see</u> <u>Mt. Emmons Mining Co. v. Babbitt</u>, 117 F.3d 1167, 1170 (10th Cir. 1997).

*1. "Shall" means shall.*   The Supreme Court and this circuit have made clear that when a statute uses the word "shall," Congress has imposed a mandatory duty upon the subject of the command.  <u>See</u> <u>United States v. Monsanto</u>, 491 U.S. 600, 607 (1989) (by using "shall" in civil forfeiture statute, "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied"); <u>Pierce v. Underwood</u>, 487 U.S. 552, 569-70 (1988) (Congress' use of "shall" in a housing subsidy statute constitutes "mandatory language"); <u>Barrentine v. Arkansas-Best Freight Sys., Inc.</u> 450 U.S. 728, 739 n.15 (1981) (same under Fair Labor Standards Act); <u>United States v. Myers</u>, 106 F.3d 936, 941 (10th Cir.) ("It is a basic canon of statutory construction that use of the word 'shall' [in 18 U.S.C. § 3553(f)] indicates mandatory intent."), <u>cert. denied</u>, 117 S.Ct. 2446 (1997); <u>see also</u> <u>Black's Law Dictionary</u> 1233 (5th ed. 1979) ("As used in statutes . . . [shall] is generally imperative or mandatory.").

Unpersuaded by the clear language of § 706 and the weight of authority interpreting the imperative nature of "shall," the Secretary argues that this court is not required to issue an injunction. Instead, the Secretary urges this court to use its equitable discretion to permit his continued non-compliance with the ESA, citing several Supreme Court opinions that hold that even in the face of a government statutory violation, the power to grant or deny injunctive relief rests in the sound discretion of the court. See Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 542 (1987); Weinberger v. Romero-Barcelo, 456 U.S. 305, 313 (1982); Tennessee Valley Authority v. Hill, 437 U.S. 153, 193 (1978). However, these cases also unmistakably hold that Congress may "restrict[] the court's jurisdiction in equity" by making injunctive relief mandatory for a violation. Weinberger, 456 U.S. at 313; see Amoco Prod. Co., 480 U.S. at 542-43 & n.9; see also TVA, 437 U.S. at 194.

While the Supreme Court has made clear that courts should not lightly infer Congress' intent to curtail the courts' traditional equitable power to exercise discretion in the granting of injunctive relief, the Court has likewise made clear Congress' power to curb the courts' discretion by clear expression. See Weinberger, 456 U.S. at 313 ("Of course, Congress may intervene and guide or control the exercise of the courts' discretion, but we do not lightly assume that Congress has intended to depart from established principles."). Through § 706

- 19 -

Congress has stated unequivocally that courts must compel agency action unlawfully withheld or unreasonably delayed.

This conclusion accords with the Tenth Circuit's established approach under the APA to requests for writs of mandamus to compel agency action unlawfully withheld. "If, after studying the statute and its legislative history, the court determines that the defendant official has failed to discharge a duty which Congress intended him to perform, the court <u>should</u> compel performance, thus effectuating the congressional purpose." <u>Estate of Smith v. Heckler</u>, 747 F.2d 583, 591 (10th Cir. 1984) (emphasis added); <u>see</u> <u>Mt. Emmons Mining Co.</u>, 117 F.3d at 1170 ("[A]s a reviewing court, we <u>must</u> 'compel agency action unlawfully withheld or unreasonably delayed.'" (emphasis added)); <u>Marathon Oil Co. v. Lujan</u>, 937 F.2d 498, 500 (10th Cir. 1991) ("Mandamus relief is an appropriate remedy to compel an administrative agency to act where it has failed to perform a nondiscretionary, ministerial duty. Administrative agencies do not possess the discretion to avoid discharging the duties that Congress intended them to perform." (citations omitted)); <u>Health Sys. Agency of Oklahoma v. Norman</u>, 589 F.2d 486, 492 (10th Cir. 1978) ("trial court <u>must</u> 'compel'" agency action unlawfully withheld (emphasis added)).

We believe our "shall"-means-shall approach has been implicitly recognized by the Ninth Circuit. In <u>Environmental Defense Ctr. v. Babbitt</u>, 73 F.3d 867 (9th

Cir. 1995), the Environmental Defense Center ("EDC") filed a suit to compel the Secretary to make a final determination on a petition to list the California red-legged frog as an endangered species, which the Secretary admitted he had failed to do by the statutory deadline. While the court stopped short of compelling immediate action, we believe the following passage indicates that it would have done so, but for the then-existing congressional spending moratorium on listing activities:

> On May 1, 1995, EDC filed the instant suit to compel the Secretary to make and publish a final determination. EDC would prevail except for the fact that between the time the Secretary failed to meet the deadline and the time EDC filed suit, Congress passed an appropriations bill which precluded the expenditure of fiscal year 1995 funds on specified activities under the ESA.

Id. at 869 (emphasis added). The Ninth Circuit held that the Secretary had violated his non-discretionary duty to take final action on the California red-legged frog by February 2, 1995. See id. at 872. However, the court recognized that the appropriations rider prevented the Secretary from complying with ESA deadlines. See id.

Notwithstanding the Ninth Circuit's statement that it would have compelled the Secretary to act absent the moratorium, the Secretary argues that Environmental Defense Center v. Babbitt supports his position that we should excuse his present non-compliance based on resource limitations. He contends that since the Ninth Circuit concluded both (1) that the moratorium did not modify

or repeal the Secretary's duties under the ESA, and (2) that a "lack of available appropriated funds prevent[ed] the Secretary from complying with the [ESA]," id. at 872, that the Ninth Circuit recognized the inadequate resources defense to the motion to compel agency action.[14] While the Secretary's argument highlights some of the ambiguity in Environmental Defense Center v. Babbitt, we accept the clear statement by the Ninth Circuit in that case that had the spending moratorium not been in effect at the time that the court rendered its decision, it would have affirmed the district court order compelling agency action. This conclusion is bolstered by the district court's disposition on remand. After a remand hearing held only 10 days after the congressional spending moratorium was lifted, the district court ordered the Secretary to "complete the listing of the red-legged frog"

---

[14]We express serious doubt as to the first conclusion, although we need not decide it in this case. We note that when a later duly enacted law of Congress makes impossible compliance with duties imposed by earlier laws, we would impute to Congress knowledge of the earlier laws and the intent to modify them. See Morton v. Mancari, 417 U.S. 535, 550 (1974) ("[T]he only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable.").

As to the second conclusion, to the extent that the Ninth Circuit held that a court considering whether to compel an agency to comply with its mandatory, non-discretionary duties should consider available resources when deciding whether to enjoin the agency, we disagree. Of course, courts must consider resource availability; but since we believe our duty to compel agency action is controlled by 5 U.S.C. §706, which strips courts of their traditional tools of equity, we hold the agency defense of unavailable resources must be reserved as a defense against contempt if an injunction issues. See infra Section III.

within two weeks. See Environmental Defense Ctr. v. Babbitt, CV-95-2867-R (C.D. Cal. May 6, 1996) (unreported order).

Consequently, we believe that Environmental Defense Center v. Babbitt supports our conclusion that if the Secretary unlawfully withheld agency action or unreasonably delayed it at a time when the moratorium was not in effect, we must compel the Secretary to perform the mandatory duties required by the ESA. With our discretion so limited, we now turn to whether the Secretary's failure to designate the silvery minnow's critical habitat within the statutory time frame constitutes agency action unlawfully withheld or unreasonably delayed.

*2. "Unlawfully withheld" vs. "unreasonably delayed."* Courts have given little attention to the distinction between agency action "unlawfully withheld" and agency action "unreasonably delayed" from the drafting of APA. However, that distinction is important in this case because the discretion Congress took away from courts by using "shall" in the first portion of § 706(1) arguably could come back to the courts through Congress' use of the modifier "unreasonably" as applied to actions "delayed" (as opposed to actions "withheld") in the second portion of § 706(1).

As with all questions of statutory interpretation, we first look to the text of Congress' provisions. Unfortunately, the ambiguity of § 706 is the source of our

confusion.  Section 706 merely sets out the alternative conditions under which a court must compel agency action — i.e., when agency action is "unlawfully withheld" or "unreasonably delayed."  Moreover, neither the APA's other substantive provisions nor its structure cast light on the meaning of § 706.[15]

Further, notwithstanding the debate concerning the propriety of finding statutory meaning by reference to legislative history, the floor debates and committee reports attendant to the APA provide little guidance regarding any possible distinction between "unlawfully withheld" and "unreasonably delayed." The Senate Report accompanying the original APA explained only that the judicial review provisions "expressly recognize[] the right of properly interested parties to

---

[15]Nor can we find any guidance regarding a distinction in the rest of the United States Code.  The terms "unlawfully withheld" and "unreasonably delayed" appear in only two sections of the Code besides the APA.  These sections explicitly or in legislative history reference 5 U.S.C. §706 and provided no further clarification.  In 1996, Congress amended the Federal Environmental Pesticide Control Act of 1972 as follows:  "If the Administrator fails to notify an applicant within the period of time required under clause (i), the failure shall be considered an agency action unlawfully withheld or unreasonably delayed for purposes of judicial review under chapter 7 of Title 5."  7 U.S.C. § 136a (h)(3)(F)(ii).  In 1989, Congress amended 38 U.S.C. § 7261(a)(2) to read:  "(a) In any action brought under this chapter, the Court of Veterans Appeals . . . shall . . . compel action of the Secretary unlawfully withheld or unreasonably delayed."  Prior to the amendment, 38 U.S.C. §7261(a)(2) only required the secretary to compel action "unlawfully withheld."  The amendment added "or unreasonably delayed" to the end of the existing law to bring it into accord with 5 U.S.C. § 706(1).  See 135 Cong. Rec. 30,627 (1989) (Explanatory Statement on the Compromise Agreement on H.R. 901, as amended).

compel agencies to act where they improvidently refuse to act."[16]  S. Rep. No. 79-752 (1945), <u>reprinted in</u> Administrative Procedure Act Legislative History, at 214 (1946).  Even the document which has been called the "Government's own most authoritative interpretation of the APA, the 1947 Attorney General's Manual on the Administrative Procedure Act (AG's Manual), which [the Court has] repeatedly given great weight," <u>Bowen v. Georgetown Univ. Hosp</u>., 488 U.S. 204, 218 (1988) (Scalia, J., concurring), fails to illuminate any distinction between "unlawfully withheld" and "unreasonably delayed."  With respect to § 10(e)(A) of the APA, the AG's Manual explains that:

> Clause (A) authorizing a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed", appears to be a particularized restatement of existing judicial practice under section 262 of the Judicial Code (28 U.S.C. 377). . . . Orders in the nature of a writ of mandamus have been employed to compel an administrative agency to act, <u>Safeway Stores, Inc. v. Brown</u>, [138 F.2d 278 (Emer. Ct. App. 1943)], . . . or to compel an agency or officer to perform a ministerial or non-discretionary act.  Clause (A) of section 10(e) was apparently intended to codify these judicial functions.
> Obviously, the clause does not purport to empower a court to substitute its discretion for that of an administrative agency . . . . However, as in <u>Safeway Stores v. Brown</u>, <u>supra</u>, a court may require an agency to take action upon a matter, without directing how it shall act.

Attorney General's Manual on the Administrative Procedure Act, at 108 (1947).

---

[16]The judicial review provision of the APA which became 5 U.S.C. § 706(1) originally appeared as § 10(e)(A) of the APA in 1946.

Thus, while the AG's Manual places the APA's judicial review provisions in their historical context and clarifies the courts' power to compel agency action, it sheds no light on the difference between agency action "unlawfully withheld" and "unreasonably delayed."[17]

In the absence of any clear statutory guidance we will simply apply the most straight forward common sense reading of these two phrases. Thus, if an agency has no concrete deadline establishing a date by which it must act, and instead is governed only by general timing provisions — such as the APA's general admonition that agencies conclude matters presented to them "within a reasonable time," see 5 U.S.C. § 555(b) — a court must compel only action that is delayed unreasonably. Conversely, when an entity governed by the APA fails to comply with a statutorily imposed absolute deadline, it has unlawfully withheld agency action and courts, upon proper application, must compel the agency to act.

Thus, the distinction between agency action "unlawfully withheld" and "unreasonably delayed" turns on whether Congress imposed a date-certain deadline

_____

[17]The Safeway Stores case cited in the AG's Manual concluded that if the Administrator should unreasonably delay final action, a court may issue a writ of mandamus directing the Price Administrator to take action upon a pending request. That case appeared, without analysis, to conflate the concepts of "unlawfully withheld" and "unreasonably delayed," perhaps because the statute it was interpreting had both an absolute time period within which the Price Administrator must act and an additional requirement that the Administrator act "within a reasonable time" within the absolute maximum time fixed for action. See Safeway Stores, 138 F.2d at 278-80.

on agency action.  See Sierra Club v. Thomas, 828 F.2d 783, 794-95 & nn. 77-80 (D.C. Cir. 1987) (citing cases and drawing a distinction between an agency's refusal to comply with an absolute time requirement for action and an agency's more generalized unreasonable delay in acting).  In our opinion, when an agency is required to act — either by organic statute or by the APA — within an expeditious, prompt, or reasonable time, § 706 leaves in the courts the discretion to decide whether agency delay is unreasonable.  However, when Congress by organic statute sets a specific deadline for agency action, neither the agency nor any court has discretion.  The agency must act by the deadline.  If it withholds such timely action, a reviewing court must compel the action unlawfully withheld.  To hold otherwise would be an affront to our tradition of legislative supremacy and constitutionally separated powers.

In support of the contrary position, the Secretary argues that we should exercise our discretion and consider the context surrounding his legislative duty, as the District of Columbia Circuit did under similar circumstances in In re Barr Labs., Inc., 930 F.2d 72 (D.C. Cir. 1991).  In In re Barr, the court refused to order the Food and Drug Administration ("FDA") to comply with a statutorily-imposed 180-day deadline for approving or disapproving generic drug applications.  The court held that the "FDA's sluggish pace violate[d] a statutory deadline," but refused to issue the writ of mandamus sought by Barr Laboratories.  See id. at 73.

Without reference to § 706, the court explained that "[e]quitable relief, particularly mandamus, does not necessarily follow a finding of a violation." Id. at 74. The court then stated that: "[o]ur leading case in this area, TRAC, identified six principles that have helped courts determine when mandamus is an appropriate remedy for agency delay . . . ." Id.[18] Dismissing the import of Congress' deadline, the court concluded that "a finding that delay is unreasonable does not, alone, justify judicial intervention." Id. at 75.

In light of the clear command of § 706, we cannot agree. Section 706 requires that a reviewing court "shall compel agency action . . . unreasonably delayed," and despite the In re Barr court's contrary conclusion, we believe that once a court deems agency delay unreasonable, it must compel agency action.

---

[18]The six factors the District of Columbia recognized in Telecommunications Research Action Ctr. v. FCC, 750 F.2d 70, 80 (D.C. Cir. 1984) ["TRAC"], are as follows:

(1) the time agencies take to make decisions must be governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"

Neither TRAC nor any of the cases it relied on to "discern the hexagonal contours of a standard" involved agency inaction in the face of a mandatory statutory deadline.[19] TRAC, 750 F.2d at 80. However helpful the hexagonal standard of TRAC may be when considering a discretionary time schedule, we decline to apply it to the Secretary's failure to designate the critical habitat for the silvery minnow where Congress has established a specific, non-discretionary time within which the agency must act. When an agency fails to meet a concrete statutory deadline, it has unlawfully withheld agency action.

## IV. REMEDY

---

[19]The FCC delay at issue in TRAC was not governed by any mandatory deadline. Instead, the only timing requirement Congress imposed on the FCC was the general APA mandate that agencies decide matters within a reasonable time. See id. at 79. Moreover, none of the cases on which TRAC relies involves mandatory agency deadlines. See Public Citizen Health Research Group v. FDA, 740 F.2d 21, 32 (D.C. Cir. 1984) (relying on APA requirement that agency "proceed to conclude a matter presented to it within a reasonable time" (quotation omitted)); Potomac Elec. Power Co. v. ICC, 702 F.2d 1026, 1034 (D.C. Cir.) (statute required ICC to "act in a timely manner"), supplemented by, 705 F.2d 1343 (D.C. Cir. 1983); Public Citizen Health Research Group v. Auchter, 702 F.2d 1150, 1158 (D.C. Cir. 1983) (ordering agency action after a finding that rulemaking was "unreasonably delayed" based in part on APA's requirement that agency act "within a reasonable time"); MCI Telecomms. Corp. v. FCC, 627 F.2d 322, 340 (D.C. Cir. 1980) (statute requiring FCC ratemaking "within a reasonable time"; Blankenship v. Secretary of HEW, 587 F.2d 329, 333 (6th Cir. 1978) (relying in part on APA's general "reasonable time" requirement).

The Secretary concedes that he failed to perform a non-discretionary duty, but urges us to excuse his failure on the basis of resource limitations and the impossibility of compliance due to the moratorium and insufficient monetary allocations since its expiration.

We are not unsympathetic to the Secretary's practical predicament. Moreover, we respect the Secretary's goal, reflected in the LPG, of prioritizing duties in order to achieve the greatest conservation benefit for the greatest number of species, instead of allowing those decisions to be driven by the exigencies of litigation. See 61 Fed. Reg. 24722, 24723-24 (1996).

While we appreciate the Secretary's objective and the difficult position in which Congress has placed him, we believe his impossibility argument is premature. The Secretary's impossibility defense (based on a generalized claim of inadequate resources) hypothetically could arise at three distinct junctures in the litigation. First, the inadequate resource argument could arise at the duty stage; essentially the claim would be that Congress' inadequate appropriations relieve the Secretary of his non-discretionary duties under the ESA. This is essentially a "repeal by implication" argument, or more precisely, a "suspension by implication" argument. However, repeals (or suspension) of legislation by implication are disfavored, especially "when the claimed repeal rests solely on an Appropriations

- 30 -

Act."[20]  Tennessee Valley Authority v. Hill, 437 U.S. 153, 190 (1978); cf. United

States v. United Continental Tuna Corp., 425 U.S. 164, 168 (1976) (It is "a

cardinal principle of statutory construction that repeals by implication are not

favored." (internal quotation omitted)).  Wisely, the Secretary does not press the

argument that inadequate congressional appropriations relieved him of his ESA

duties.  We could not accept that argument if it had been raised, especially in light

of the fact that the specific statutory date by which the Secretary was required to

designate the critical habitat for the silvery minnow had already passed one month

before the moratorium was enacted, and the Secretary has continued to ignore that

clear statutory deadline for more than two-and-one-half years since the moratorium

has been lifted.

Second, the inadequate resources defense could arise at the remedy stage;

the claim would be that notwithstanding the Secretary's failure to perform a

mandatory duty, lack of resources should cause this court to disregard the

mandated statutory remedy.  The Secretary does advance this argument, but in

light of the lengthy discussion above, we cannot accept it.  In sum, we hold that

---

[20]We distinguish the present circumstances from those in effect during the
moratorium.  While the express congressional moratorium was in effect, that
congressional enactment constituted an express suspension of the Secretary's
listing responsibilities under the ESA.  However, once the moratorium expired,
the Secretary can no longer point to any extant legislation expressly modifying his
duties under the ESA.

Congress, through 5 U.S.C. § 706, has explicitly removed from the courts the traditional equity balancing that ordinarily attends decisions whether to issue injunctions. In the face of Congress' clear command, the Secretary's inadequate resource argument must fail with respect to the appropriate remedy. Section 706 requires us to compel the unlawfully withheld agency action.

Third, the inadequate resources defense could arise at the contempt stage, as a traditional impossibility defense at any subsequent contempt proceeding that may occur if the Secretary fails to comply with an order enjoining him to designate the critical habitat by a time certain. See United States v. Rylander, 460 U.S. 752, 757 (1983) ("In a civil contempt proceeding . . . a defendant may assert a present inability to comply with the order in question."); Donovan v. Burgett Greenhouses, Inc., 759 F.2d 1483, 1486 (10th Cir. 1985) ("the defendant could avoid a contempt adjudication by showing through clear and convincing evidence that he was unable to meet the requirements of the injunction"); NRDC v. Train, 510 F.2d 692, 713 (D.C. Cir. 1975) (noting, with respect to the Administrator of EPA claiming inadequate resources to comply with statutory duty, that "[t]he sound discretion of an equity court does not embrace enforcement through contempt of a party's duty to comply with an order that calls him to do an impossibility"(quotation omitted)). While the Secretary's historic practice and oral assurance during argument convince us that the Secretary will comply with court orders, we note that in a

contempt proceeding, if one should occur, the Secretary will have the opportunity of proving impossibility.  See Donovan, 759 F.2d at 1486.

## V.  CONCLUSION

We hold that the Secretary violated his non-discretionary duty by failing to designate the critical habitat for the Rio Grande silvery minnow by the statutory deadline.  After all the permissible delays and extensions, the ESA required the Secretary to publish a final critical habitat designation by March 1, 1995.  This preceded any appropriations cutback or moratorium on spending.  Moreover, the moratorium on funding activities essential for making critical habitat designations ended well over two years ago.  In sum, the Secretary unlawfully withheld agency action here, and we are required by § 706 to compel the Secretary to act.

That said, we are left to work out the details.  Concerned by the Secretary's delay and the prospect of more delay if the case is remanded to the district court, plaintiffs ask this court to order the Secretary to complete the critical habitat determination within 30 days.  In support of this remedy, plaintiffs cite nine district court orders requiring the Secretary to comply with statutory obligations, within between 5 and 120 days.  The plaintiffs, however, cite no case in which a circuit court has set the deadline for compliance.

While we hold that the Secretary must be ordered to comply with his statutory duty to designate the critical habitat for the silvery minnow without regard to his preferred priorities, any order now to impose a new deadline for compliance must consider what work is necessary to complete the designation and how quickly that can be accomplished. Accordingly, we remand the case to the district court with instructions to order the Secretary to issue a final critical habitat designation for the silvery minnow as soon as possible, without regard to the Secretary's other priorities under the ESA.

For guidance, we refer the district court to the proceedings in Environmental Defense Center v. Babbitt, 73 F.3d 867 (9th Cir. 1995). There, in a case decided during the moratorium, the Ninth Circuit held that the Secretary violated his nondiscretionary duties to take final action on the California red-legged frog, but remanded to the district court to specify the time for compliance with the ESA after appropriated funds became available. See id. at 872. At a hearing which took place only 10 days after the moratorium was lifted, the district court ordered the Secretary to list the red-legged frog within 14 days. See Environmental Defense Center v. Babbitt, CV-95-2867-R, (D. C. Cal. May 6, 1996), Appellant's Appendix, at 145.

We REVERSE the district court's denial of plaintiffs' motion to review agency action, VACATE the stay order, and REMAND to the district court to

order the Secretary to publish a final critical habitat designation for the Rio

Grande silvery minnow <u>as soon as possible</u>.